GRASELLI CHEMICAL CO. v. ÆTNA EXPLOSIVES CO., Inc.

Appeal of FAY et al.

(Circuit Court of Appeals, Second Circuit. May 24, 1918.)

No. 253.

1. CORPORATIONS ⬤⟶559(1)—RECEIVERS—APPOINTMENT—EFFECT.

An order appointing receivers places a corporation in the custody and control of the court, and the court, in addition to restraining the corporation and its officers from exercising any privileges or franchises, may restrain the stockholders from meeting and electing new directors, when such action is for the best interests of all concerned.

2. EQUITY ⬤⟶55—JURISDICTION—SCOPE.

A court of equity's modes of relief are not fixed and rigid, and, having jurisdiction in the whole domain of conscience, limited only by legislative enactment it can mold its remedies to meet conditions with which it has to deal.

3. CORPORATIONS ⬤⟶560(2)—RECEIVERS—DUTIES.

A receiver of a corporation is appointed on behalf of all parties interested, and he represents the stockholders, as well as the creditors.

4. CORPORATIONS ⬤⟶574—REORGANIZATION PLANS—FAIRNESS.

Where receivership for a corporation in difficulties resulted in increased profits, so that indebtedness could be paid and dividends paid on preferred stock, held, that proposed reorganization plan which would enable preferred stockholders, not entitled to vote except when dividends were in arrears to take advantage of the temporary condition and control the corporation was unfair, so it was proper for the court to stay action at a proposed stockholders' meeting.

Ward, Circuit Judge, dissenting.

Appeal from the District Court of the United States for the Southern District of New York.

Bill by the Graselli Chemical Company against the Ætna Explosives Company, Incorporated, on which a receiver was appointed. From an order staying any action at a stockholders' meeting, except adjournment, Addison G. Fay and another appeal. Affirmed.

The complainant, a general creditor of the defendant, filed a bill in equity on April 19, 1917, praying for the appointment of receivers of the defendant. The bill alleged: That the defendant was furnishing large quantities of explosives to the Allied Powers in the prosecution of the war. That interrup-

⬤⟶For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

tion of this business would be injurious to the defendant and its creditors, as well as to the success of the United States and the Allied Powers in the war. Certain extravagant and obnoxious contracts were assumed by the defendant, through its officers, for the payment of millions of dollars as commission to one Bassick for services alleged to have been performed by him in effecting the making of certain contracts between the defendant and the French government. Further, that there are outstanding bonds of the defendant amounting to $2,188,050 under a trust mortgage, and that the defendfendant had a large indebtedness for merchandise. It was alleged that the defendant's property, at a fair valuation, is more than sufficient to pay all its debts; that, because of these large claims, its credit has been impaired, and it was unable to obtain money with which to meet its obligations as they matured in the ordinary course, or to conduct its business in an efficient manner; and that an attempt by the complainant to enforce at law its claims as a general creditor would precipitate some action on the part of other creditors, and that this in turn would lead to wasteful strife and controversy, which could be avoided by a receivership. All this was admitted by the answer of the defendant. Thereupon the District Judge appointed Hon. George C. Holt, a former judge of the District Court, and Hon. Benjamin B. Odell, a former Governor of New York state, receivers. This order provided that the receivers have complete and exclusive control, possession, and custody of all the assets and property of the defendant, and directed those in possession or in charge of the property of the defendant to turn over the same to the receivers, who were authorized to continue in business with full authority for its management and operation, and to employ necessary servants to carry on, manage, and conduct the business.

The receivers have so conducted the business that all parties to this controversy are enthusiastic about the success achieved. The report of the receivers, filed February 7, 1918, indicates that the Bassick claims have been settled and disposed of at a very materially reduced sum, and the receivers have contracts for approximately $54,000,000 with the allied governments. The profits for the year ending December 31, 1917, have been so large that the surplus of assets over liabilities shown by the receivers' consolidated balance sheet of the defendant and its subsidiary companies on December 31, 1917, is $538,647. The creditors, other than those represented by the bonded indebtedness, have been paid 50 per cent. of their claims, and it is now said that the receivers have approximately $3,000,000. The excellent condition of the business conducted by the receivers indicates that in the near future the balance of all valid claims against the defendant will be paid; the bonded indebtedness may be paid, and the property returned to the stockholders free of debt, with unimpaired credit, and with ample working capital. The contracts with the Allied Powers are very profitable and fully warrant this claim. There is pending an unfinished litigation in which bondholders claim that the bonded indebtedness is now due because of the appointment of the receivership, although the interest has been paid on the bonds. Even though this should be resolved in favor of the bondholders, the receivers are now amply able to meet this obligation in full.

At the time of the appointment of the receivers, the capital stock of the defendant consisted of 55,000 shares, 7 per cent. preferred stock, par value $100 per share, and 18,100,000 shares of common stock, of no par value. When first organized, the authorized capitalization was $7,000,000 common stock and $5,500,000 preferred stock; but in February, 1916, the certificate of incorporation was amended so as to provide that the common stock should consist of 18,100,000 shares, the preferred stock remaining the same. The preferred stock was not entitled to any vote, except upon the question of placing a mortgage upon the company's property; but, when the common stock was increased, it was provided that, in the event there should be default in the payment of the dividends of the preferred stock for a period of eight months or more, then each share of preferred stock was entitled to nine votes. The dividends on the preferred stock were paid with regularity until the appointment of the receivers. During the period of receivership, the dividends have not been paid, and more than eight months have elapsed and therefore the

right of the preferred stockholders to vote has accrued. The annual meeting fixed by the by-laws was to be held on Tuesday, March 19, 1918. For some days prior thereto, considerable activity among groups of the stockholders indicated a contest to be waged on that day for control of the company, by the election of a board of directors and the submission of a plan of readjustment. The District Judge, on the day of the meeting, granting an order to show cause, containing a stay, preventing any action at the meeting except the adjournment of the meeting until 30 days after the determination of the receivership, subject to modification by the court. On the same day, the order was modified, upon application, so as to adjourn the annual meeting until March 26, 1918, pending a hearing upon the motion brought on by the order to show cause. The District Court then granted the order appealed from, directing that there be no action of any kind by the board of directors, except by order of the District Court permitting the same after a hearing upon an application made to the court on 5 days' notice to counsel for the interests supporting the readjustment plan, and the order enjoined the stockholders from taking any action except to adjourn the meeting from month to month until a date not less than 30 days prior to the termination of the receivership and the discharge of the receivers of the defendant, when the election might take place and the new board of directors elected. Provision was made for modification of the order upon 5 days' notice.

Stockholders Fay and Howard, feeling aggrieved thereby, have appealed.

Royall Victor, Severo Mallet-Prevost, and William H. Button, all of New York City (George W. Wickersham, Edwin P. Grosvenor, and C. Westley Abbott, all of New York City, of counsel), for appellants.

Stanchfield & Levy, of New York City (John B. Stanchfield, William M. Parke, George W. Schurman, and Henry Wollman, all of New York City, of counsel), for appellees Price and Taylor.

Hughes, Rounds, Schurman & Dwight, of New York City (George W. Schurman, of New York City, of counsel), for appellees Erb and Rogers.

Wollman & Wollman, of New York City (Henry Wollman, of New York City, of counsel), for appellees Lovell & Co.

Rosenberg & Ball, of New York City (James N. Rosenberg and Wilbur L. Ball, both of New York City, of counsel), for appellee committee.

Before WARD, ROGERS, and MANTON, Circuit Judges.

MANTON, Circuit Judge (after stating the facts as above). The petition upon which the order appealed from was granted, after reciting that Prince & Company, the petitioners, are the owners of common stock, alleges that the receivership has been a successful one, and substantially the facts stated above, and, further, that the plan of readjustment hereinafter referred to is sought to be adopted by certain preferred stockholders exercising their claim of voting rights by reason of the default in the payment of dividends. Copy of the readjustment plan is made a part of the petition, and it is alleged that, if approved and adopted, it would be in violation of the rights of the common stockholders. It points out, further, that no new capital is to be paid in or provided for by the readjustment agency, and that, for the services of the so-called readjustment, they are to be paid $750,000. The effect of this, it is said, will give the bondholders and preferred stockholders the privileges and rights to which they are not

entitled under the contractual obligations of the defendant, and will place in control a board of directors who would be unfavorable and unjust to the interests of the common stockholders, and who will assist in the adoption of the readjustment plan, with the result that great and irreparable injury will be done the petitioner and a great majority of the common stockholders. The appellants assert that the District Judge had no power to interfere with the stockholders of the defendant in the election of the directors, at the annual meeting of the company, and it is said that the injunction granted by the District Court is entirely outside of the scope of the bill of complaint and of the receivership thereunder.

[1] The order appointing the receivers placed the corporation in the custody and control of the court. It placed the receivers under the admonition, direction, and guidance of the court. The court possesses jurisdiction over the corporation, as well as over the property of the corporation, and it has complete power to deal with either, and it is essential that it should have, for it could not control the property without the power to control the corporation. The appointment of the receiver supersedes the power of the directors to carry on the business of the corporation, and the receivers take possession of the corporation, its books, its records, and assets. Indeed, it is often the custom for courts of equity, in an order appointing the receiver, to expressly restrain the corporation and its officers from exercising any of the privileges or franchises of the corporation until the further order of the court. The court's power to take from the directors their right to direct can also, while in control, restrain action by the stockholders, when it deems it for the best interests of all concerned to do so.

[2] A court of equity's modes of relief are not fixed and rigid. It can mold it remedies to meet the conditions with which it has to deal. The jurisdiction of equity is the whole domain of conscience, limited only by legislative enactment. The faculty of equity must be energetic, productive, and progressive. But to exercise this right of the court of equity there must be some show of an injustice attempted or about to be perpetrated upon the petitioners. Judge Ward, writing in Davidson v. American Blower Co., 243 Fed. 167, 156 C. C. A. 33, announced that the court of equity had the power in the proper case "to deprive stockholders holding a majority of the stock from voting it, and to turn over the control of a corporation to the minority stockholders." In Lehigh Coal & Navigation Co. v. Central R. R. Co., 35 N. J. Eq. 349, an insolvent corporation in the hands of the court, with its railroad operated by a receiver, refused to hold a meeting of the stockholders. A petition was addressed to the court to direct such a meeting, which the court denied in the following language:

"The affairs of the company had for many years been in the hands of this court. There had been no election of directors by the stockholders since the insolvency was declared. The existing board disputed the power of the stockholders to hold the election. The proceeding was under a provision of the law, the applicability of which to an insolvent company, whose affairs were under the management of the court, was denied. It was quite evident that

the election, if held under the circumstances, would be subject to imputations of surprise and unfairness, and to questions as to its validity, which would lead to litigation or induce this court to refuse to recognize it as a just and proper expression of the choice of the stockholders. Hence it was not permitted to take place."

[3] A mistaken notion seems to exist with the appellants that the receivers are appointed for the sole benefit of creditors and are not interested in the benefits to accrue to all other parties interested, such as stockholders. In Atlantic Trust Co. v. Chapman, 208 U. S. 360, 28 Sup. Ct. 406, 52 L. Ed. 528, 13 Ann. Cas. 1155, the court said that a receiver—

"is appointed in behalf of all parties, and not of the complainant or of the defendant only. He is appointed for the benefit of all parties who may establish rights in the cause."

In Western Union Telegraph Co. v. United States & Mexican Trust Co., 221 Fed. 545, 137 C. C. A. 113, Sanborn, J., said:

"The property of an insolvent railroad corporation in the custody of a court in a suit to foreclose a mortgage upon it is charged with a trust for the benefit, first, of the holders of preferential claims superior in equity to the lien of the mortgage; second, of the holders of the lien of the mortgage and of other such liens in their order of priority; third, of the unsecured or general creditors of the mortgagor; and, fourth, of its stockholders."

In Hayes v. Pierson, 65 N. J. Eq. 353, 45 Atl. 1091, 58 Atl. 728, Vice Chancellor Stevens said:

"The receiver is, it is true, the representative of the creditors, but he is also the representative of the corporation and of its stockholders."

The possession of the receiver is the possession of the court; and the court itself holds and administers the estate, through the receiver as its officer, for the benefit of those whom the court shall ultimately judge to be entitled to it. Porter v. Sabin, 149 U. S. 473, 13 Sup. Ct. 1008, 37 L. Ed. 815. The District Judge stated that he did not pass upon the merits or demerits of the readjustment plan. He said in effect that the election at the present time would not be in the interest of the success and welfare of the receivership or of the corporation and the stockholders, but that it should be adjourned and held at a later date well in advance of the time when the receivership was about to come to an end, subject to the right of modifications reserved.

In this court, the appellees, large common stockholders, have attacked the merits of the readjustment plan, and, we believe, with just cause. In the absence of power created by legislation in this country, the federal judges, sitting in courts of equity, have endeavored to secure to the rights of those interested, including the stockholders at the time of readjustment of large corporations a protection to meet the needs of the occasion. Changing times, with change in economic needs, require the courts of equity to mold remedies to meet the conditions with which they have to deal. In railroad foreclosure suits, where plans of reorganization were proposed, the federal courts have exercised the right of approval or disapproval. Fearon v. Bankers' Trust Co., 238 Fed. 83, 151 C. C. A. 159; Guaranty Trust

Co. v. Missouri Pacific Ry. Co. (D.C.) 238 Fed. 812. In the latter case, Judge Hook said:

"It has sometimes been claimed that plans of reorganization formulated by bondholders and stockholders of a railroad in the hands of receivers are exclusively of private concern, free from judicial action or interference. But for various reasons the view cannot be sustained in principle. After all that can be said from the standpoint of theory and strict right, the fact remains that many railroad receiverships, and the one here is typical of them, are the instruments for consummating plans of reorganization, and courts have come to realize that such use of their jurisdiction and processes entails a correlative duty to those affected by the result. * * * The relation between the receivership * * * and the plan of reorganization agreed upon is close and intimate. So far as properly can be, the judicial proceeding is conducted in harmony with the plan, and the success of the agreed readjustment is promoted by the orders of the court and the acts of its receivers. Generally the judicial course would not be different if the court were carrying out a plan of reorganization of its own making or one affirmatively adopted by judicial order or decree. * * * while it is the settled doctrine that reorganizations will be encouraged, yet, on the other hand, a court of equity will not lend its aid to one that is inequitable or oppressive. * * * The conclusion is manifest that the general duty of a court in a railroad foreclosure suit to take cognizance of a plan of reorganization by the bondholders and stockholders which is to be aided by its decree, and to protect the equitable rights of all, becomes specific and imperative upon the complaint of an interested party."

So long as the suit continues, the corporation and the res are in the possession of the District Court; the court having the power as an incident thereto, and as ancillary to its proceedings, to determine when and under what circumstances an election may be held which will determine what persons will receive the property from the corporation and control the property upon the discharge of the receivers.

[4] Was there justification therefor under the circumstances disclosed here? It is claimed that at the meeting a board of directors was to be elected, which would permit the control of the corporation to pass into the hands of the preferred stockholders. It is said that they represent the same group of men who so mismanaged the property as to result in a receivership. At this time there appears to be no requirement for new capital, nor is any offered by the plan of readjustment. The property is being successfully managed by the receivers; it has very profitable contracts, and is, or will very shortly, be able to pay all its indebtedness, including the bonded indebtedness, if need be. It can pay the arrears of dividends on the preferred stock, and may retire the preferred stock. If the dividends are paid, the right of the preferred stock to vote on the basis of nine for one is eliminated, and, when a meeting is held, the business policy of the corporation can be determined by the will of the majority of common stockholders. Therefore, the right of the preferred stockholders to vote being but temporary, with every prospect of the common stockholders regaining control of the corporation, the court should not lend its aid nor permit a group of preferred stockholders electing a board of directors who would permit this plan of readjustment to be adopted. Although it is not admitted by the appellants that it is the intention to vote upon the readjustment plan at this meeting, the fact is evident that such is the plain intention.

On their face, the bonds do not mature until 1945. The plan of readjustment provides for their payment at an earlier period. These bonds, are largely held by the owners of the preferred stock, both of which securities were obtained as part of the purchase price for plants which were sold to or consolidated with the defendant corporation at the time of the consolidation. The plan further creates a retirement provision for the preferred stock, which is not only a deprivation of the common stockholders' rights, but it would seem is injurious to the preferred stockholders as well. It creates a voting trust of the common stock, and therefore deprives the common stockholders of control of their company. It leaves the future of the corporation to a new company, and, without apparent limitation, places it in the hands of readjustment managers, with unrestricted power given to issue and dispose of new securities, and grants them an allowance of $750,000 for their services. The entire plan means a large and unnecessary expense, and reduces the cash assets of the company, which might again result in another period of financial embarrassment. In our opinion, the complaint of the common stockholders is fully justified. The court below, in the exercise of its obligation to the common stockholders and all others interested, might well, in its equitable protection, have inquired into the merits of the plan of readjustment, and have granted the order appealed from upon its disapproval of the same. The course pursued by the court below was well within its power. The original intention of the corporation and the stockholders, as evidenced by its charter, giving no right to vote to the preferred stockholders, except as above indicated, indicates the right of the common stockholders to exercise control and management of the corporation.

From the above indications, when the deferred dividends are paid out of the surplus profits, which are very rapidly accumulating, the property of the corporation and the control thereof will pass to the common stockholders, where it was when the court took possession of the property, and with this course no injustice will be visited upon any of the interested parties.

Order affirmed.

ROGERS, Circuit Judge (concurring). I concur in the result reached, but do not find it necessary to consider the reorganization plan. The sole question is whether a court which has taken over the management of the affairs of a corporation, having appointed receivers who are administering its business, has the right, while still in control, to prevent by injunction a meeting of the stockholders. I am satisfied that it possesses that power, and that its jurisdiction extends, not only over the property of the corporation, but over the corporation itself, so that during the time its possession continues it has authority to restrain the action of both directors and stockholders. Its right to restrain the action of the directors seems to be unchallenged. But why it should be supposed that stockholders, either preferred or common, cannot be restrained, while directors may be, I am unable to comprehend. It is the duty of a court managing, for the time being, through its receivers, the affairs of a corporation, to protect, so far as it can

while in possession, the rights of all parties in interest, both creditors and stockholders common and preferred. As neither directors nor stockholders have any right to take effective action which will embarrass the court in its management of the property so long as the receivership continues, or which will, when the receivership ends, prevent the court from restoring the property to the hands of those from whom it received it, I think Judge Mayer was quite within his discretion in the action which he took.

At the time he assumed control of the corporation the preferred stockholders did not possess the right to vote, under the terms of their contract with the corporation. Whatever right to vote they now possess has vested in them during the period of the receivership. The court has the right to pay all the liabilities of the corporation including the liabilities to the preferred stockholders. The fast accumulating surplus in the hands of the receivers indicates that the court will soon be able to terminate the receivership and restore the property to the common stockholders, who will be entitled to the management of its affairs when the unpaid and cumulative dividends due to the preferred stockholders are paid. The preferred stockholders, with a thorough knowledge of that probability, therefore desire, before the liabilities are paid and their right to vote is by the terms of their contract gone, to hold a stockholders' meeting at which they may cast nine votes for each share of stock they hold, and thus put through a plan of reorganization, the merits of which are not involved, but which will alter in a very substantial manner the relations of these two classes of stockholders. It seems to me impossible to hold that any body of stockholders has an absolute right to a stockholders' meeting while a court is in control of the corporation. If there is no such absolute right, then it must be within the court's discretion to say whether it will allow and when a meeting to be held; and in this case I discover, as I have stated, no abuse of that discretion.

It is doubtful whether, in the whole history of receiverships, either in the Southern district of New York or in any other district in the United States, there can be found another receivership which has been conducted with such phenomenal success as has attended the receivership over the defendant corporation. This success is due in part to the business acumen of the receivers, Hon. George C. Holt and Hon. Benjamin B. Odell, and in part to the phenomenal conditions which now prevail in this country and in Europe. At the beginning of the receivership, April 20, 1917, the outstanding liabilities exceeded in amount $4,608,475.58, and on December 31, 1917, they were $1,448,420.26, showing a reduction of $3,160,055.32; and on February 7, 1918, the receivers reported a cash balance of $1,369,170.33. The enormous profits being realized upon the contracts now being carried out by the receivers give every assurance that the preferred stockholders will soon be paid every dividend claim they have against the company. Indeed, in view of the prosperous conditions which now prevail in the affairs of the corporation, with earnings at the current rate understood to be from $400,000 to $700,000 a month, it is quite probable that the assets of the company will be so large that soon the outstanding preferred stock can be paid off, if it be thought wise to take such action.

It seems to me it would be a great injustice to permit the preferred stockholders to meet as proposed, and thus take advantage of a situation which is temporary to put through a revolutionary plan, which, whatever its merits or demerits would alter radically the relations of the parties. If the court had permitted the meeting to be held, it might be a serious question whether the court had not abused its discretion. The only fair and proper course was the one which was adopted, and which in the end will restore the corporation, with its debts paid, including those of the preferred stockholders, to the common stockholders, from whose control it was originally taken; and with that the result it cannot be successfully maintained that wrong has been done to any one.

WARD, Circuit Judge (dissenting). When a court is selling the whole property of a corporation under a decree of foreclosure, with a view to distributing the proceeds of sale among the parties entitled, it may properly look into the fairness of any plan of reorganization under which the property has been purchased or is proposed to be purchased. In other words, the court will affirm the sale if the terms of the reorganization agreement are fair, and will refuse to do so if they are not. Such decisions are relied on to support the order of the District Court. Western Union Telegraph Co. v. United States & Mexican Trust Co., 221 Fed. 545, 137 C. C. A. 113; Fearon v. Trust Co., 238 Fed. 83, 151 C. C. A. 159; Guaranty Trust Co. v. Missouri & Pacific Railway Co. (D. C.) 238 Fed. 812.

The present case is entirely different. There is no intention, and never has been any intention, that the receivers shall sell the property and distribute the proceeds. On the contrary, from the beginning the corporation has been treated as solvent. Temporary receivers were appointed to protect it by continuing its business and paying its current liabilities, until suits upon certain unjust claims which had impaired its credit and threatened to destroy it should be defeated. The holding of the annual meeting for the election of directors will not in any way affect or interfere with this purpose. The title, possession, and control of the company's property in the hands of the receivers will continue, whatever may be the result of such an election. The District Court will manage the company's business, control its assets, and protect them from interference until the purpose of the receivership is accomplished and its property returned to the corporation.

Judge Mayer expressly stated in his order that he "refrained from passing upon the merits of the proposed readjustment plan." He seems to have assumed the present right of the preferred stockholders to vote nine votes for each share as provided in the charter, and to have been moved by the feeling that they should not exercise this right because it was likely that the receivers would soon be able to terminate it by paying up all arrears of dividends on the preferred stock. But the event has happened which gives the preferred stockholders this right, and they should not be deprived of it until it has been judicially determined that they are not entitled to exercise it. The receivers have no interest whatever in a dispute between two classes of stockholders as to their respective rights under the charter.

Nor can I see how the election of directors would affect the adoption of the readjustment plan in any way. It is not proposed to carry it out by a sale under a decree of foreclosure, no such decree being contemplated. It can only be accomplished by a dissolution of the corporation without judicial proceedings under sections 9 and 10 of article 2 of the Stock Corporation Law (Consol. Laws, c. 59), which require that a majority of the whole board of directors shall first adopt a resolution that a dissolution is advisable, and shall then call a meeting of the stockholders to consider the subject, not less than 30 nor more than 60 days after the resolution; notice to be given by advertisement or by mail or personal service on each stockholder. If two-thirds in amount of the outstanding stock consent, the corporation shall file the consent in the office of the secretary of state. Then the corporate assets shall be sold to pay its debts, and with the consent of two-thirds in amount of the stockholders any remaining assets may be transferred to a new corporation; but the sale shall not be valid against any objecting stockholder who is not paid the value of his stock as appraised under an order of the Supreme Court of the state of New York. It is not suggested that these steps were proposed to be taken, or could be taken, at the annual meeting to elect directors; and, if they could be and were to be taken in accordance with the law, then the readjustment plan would be legally adopted, and no court could disturb it as being unfair.

This court sustains the order of the District Court because it thinks that the proposed readjustment plan, which is capable of being legally adopted, is unfair. I think this is inconsistent with our decision in Davidson v. American Blower Co., 243 Fed. 167, 156 C. C. A. 33.